## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cassandra L. Mehl,

                              Plaintiff,          Civ. No. 11-36 (RHK/LIB)

                                           **MEMORANDUM OPINION AND ORDER**

v.

PortaCo, Inc. and Timothy Wilson,

                             Defendants.

Katherine M. Vander Pol, Matthew H. Morgan, Nicholas Kaster, PLLP, Minneapolis, Minnesota, for Plaintiff.

Bruce A. Shoenwald, Stefanson Law, Moorhead, Minnesota, for Defendants.

## INTRODUCTION

This action arises out of Plaintiff Cassandra Mehl's employment with Defendant PortaCo, Inc ("PortaCo"). Mehl alleges she was subjected to a hostile work environment and constructively discharged in violation of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 et seq. She also asserts a common-law battery claim against PortaCo and Defendant Timothy Wilson, PortaCo's president and majority owner. Defendants now move for summary judgment. For the reasons that follow, the Motion will be granted in part and denied in part.

**BACKGROUND**

PortaCo makes hydraulic power units and small tools in Moorhead, Minnesota. Wilson is PortaCo's President and Treasurer and owns 75% of the company.  (Wilson Dep. at 27-28.)  He determines whether employees are hired, fired, or promoted, with some assistance from Jim Julsrud, the welding supervisor.  (Id. at 29-31.)

Mehl began working for PortaCo as a welder in July 2010.  (Mehl Dep. at 18.) Like all new PortaCo employees, she was hired subject to a 90-day probationary period. (Julsrud Dep. at 30.)  She was one of only three female employees at PortaCo, and the only woman who worked on the shop floor.  (Id. at 44-45, 59; Wilson Dep. at 63-64.)

Wilson also had a workspace on the shop floor and would often walk through the area and interact with the employees.  (See Wilson Dep. at 96, 98.)  He frequently tapped or slapped employees on the backside while walking past them.  (Id. at 95-96; Stam Dep. at 11-12.)  One former female employee recalled an instance when he "ran his fingers from [her] hips to [her] armpits" while she was at the drinking fountain and made comments about the appearance of her breasts.  (Wourms Aff. ¶¶ 6, 7.)  Another employee observed him putting his hands on a different female employee's buttocks. (Stam Dep. at 15.)  PortaCo managers and employees characterized Wilson's behavior as "par for the course" and "didn't think he meant anything by it."  (Id. at 16; Julsrud Dep. at 38.)

Mehl and Wilson worked in close proximity at PortaCo, occasionally within a foot of each other.  (Julsrud Dep. at 29, 66-68; Wilson Dep. at 99-100.)  During her first week of employment, Wilson stuck his foot between her legs while she was squatting and

welding, causing her to fall.  (Mehl Dep. at 26-28.)  She told him, "Don't touch me," and he laughed and walked away.  (Id. at 29.)  She immediately went to Julsrud, her immediate supervisor, and reported the incident.  (Id.; Wilson Dep. at 33; Julsrud Dep. at 36-37.)  Julsrud "tried to smooth things over" and told her that Wilson is "just flirty." (Mehl Dep. at 37; Julsrud Dep. at 37.)  Julsrud did not immediately speak with Wilson about the incident but eventually approached him.  (Julsrud Dep. at 39-40.)  Wilson said he had tripped and accidentally grabbed Mehl, and Julsrud took no action in response to her complaint.  (Id. at 40-41.)  Later that week, Wilson lifted up Mehl's shirt and tried to reach inside her front pants pocket.  (Mehl Dep. at 30.)  He said that he was looking for a pen.  (Id.)  She told him not to touch her and that he was "invading [her] personal space." (Id.)  A few minutes later, he again reached in her pants pocket.  (Id.)

Similar events occurred throughout Mehl's employment.  In late July 2010, Wilson used a piece of chalk to circle her left breast on the outside of her welding jacket. (Id. at 34-36.)  In August, he was having Mehl cut several pieces of metal when he held a tape measure "in front of his crotch saying give me nine inches."  (Id. at 36.)  She immediately reported this incident to Julsrud, who again did not take action.  (Id. at 36-37.)  Later that month, Wilson asked her to grab his tape measure from his front pants pocket.  (Id. at 38.)  When she told him to have one of the guys get it, he responded, "Young lady, you better be mindful of your actions."  (Id. at 39.)  She told him that this behavior made her uncomfortable and that she could not work under such conditions. (Wilson Dep. at 103, 105, 120.)

In September and October 2010, Wilson "often" walked behind Mehl and touched her backside while she was welding. (Mehl Dep. at 40.)  In September, both attended an employee training function, and Wilson stood behind her and rubbed her back and outlined her bra straps with his hands while addressing other employees. (Stam Dep. at 17-18.)  Mehl's coworkers noticed this behavior, and one male coworker advised her to find other employment to escape Wilson's harassment. (Id. at 17-20.)  In early October, Wilson walked up behind her and grabbed her backside and reached between her legs. (Mehl Dep. at 50-51.)  She began to cry and walked very quickly through the shop to the restroom, saying "No, I don't want to be touched." (Id.; Myhre Dep. at 31.)  Wilson followed her, saying that it would not happen again. (Mehl Dep. at 51; Myhre Dep. at 31.)  A few days later, he walked up behind her and began rubbing her back and shoulders. (Mehl Dep. at 52.)

During her employment at PortaCo, Mehl received medical attention for stress-related symptoms. (Id. at 116-20.)  She suffered nosebleeds from late summer until December 2010. (Id. at 115-16.)  Other symptoms that she attributes to facing and coping with Wilson's behavior include diarrhea, headaches, nausea, and elevated blood pressure. (Id. at 67, 117-19.)

On October 14, 2010, Julsrud and Wilson met with Mehl because her 90-day probationary period was ending. (Id. at 52.)  Julsrud discussed her attendance and told her that she was missing "a bit more work than [he] would have liked," and Wilson agreed. (Julsrud Dep. at 30-32.)  She attributed her attendance problems to migraines.

(Id.)  Nonetheless, she was offered a small raise and full-time employment.  (Id. at 34.)
No one discussed Wilson's behavior at the meeting.  (Mehl Dep. at 54-55.)

Mehl did not go to work the next day.  (Julsrud Dep. at 60.)  The following
Monday, she called and told Julsrud that she would not be returning to PortaCo because
she "wasn't comfortable and couldn't come back."  (Id. at 61; Mehl Dep. at 56, 59.)  He
replied, "You gotta do what's best for you."  (Julsrud Dep. at 61-62; Mehl Dep at 56-57.)
Wilson left a voicemail message for Mehl the same day asking her not to quit.  (Vander
Pol Aff. Ex. L.)  She did not return to PortaCo.

Mehl filed a Charge of Discrimination with the Equal Employment Opportunity
Commission (EEOC), and she was issued a right-to-sue letter on November 23, 2010.
(Doc. No. 65, Ex. 13.)  She commenced the present action on January 6, 2011; with
discovery now complete, Defendants have moved for summary judgment.  The Court
heard oral argument on March 30, 2012, the issues have been fully briefed, and the
Motion is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the
nonmoving party, there is no genuine issue as to any material fact and the moving party is
entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,
477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the
material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573
F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that
may be reasonably drawn from it, in the light most favorable to the nonmoving party.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

## ANALYSIS

### I.    The Discrimination Claims

### A.  Hostile Work Environment

Mehl asserts she was subjected to a hostile work environment while employed at PortaCo in violation of both Title VII and the MHRA.  To establish this claim, she must prove that:  (1) she was a member of a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of her employment.  Beard v. Flying J., Inc., 266 F.3d 792, 797-98 (8th Cir. 2001).[1]  Defendants challenge only the third and fourth elements of Mehl's claim, arguing that (1) she was not treated differently because of her sex, and (2) that a reasonable person would not have found Wilson's behavior severe and pervasive.  The Court is not persuaded by either argument.

---

[1] Mehl's claim under the MHRA is evaluated under the same standard as her Title VII claim. See Riser v. Target Corp., 458 F.3d 817, 820 n.2 (8th Cir. 2006); Goins v. W. Group, 635 N.W.2d 717, 724 n.3 (Minn. 2001).

### i.   Harassment Based on Sex

Defendants first argue that Mehl was not treated differently because she was a woman, since there is no evidence Wilson was pursuing a sexual relationship with her. (Mem. in Supp. at 7.)  But Wilson's behavior, even if not sexually motivated, might still be actionable.  See, e.g., Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) ("[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."); Montgomery v. Indep. Sch. Dist. No. 709, 109 F. Supp. 2d 1081, 1088 (D. Minn. 2000) (sexual orientation of alleged harasser is not dispositive).  "The proper inquiry is whether 'members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'"  Escobar v. Swift & Co., 494 F. Supp. 2d 1054, 1061 (D. Minn. 2007) (Frank, J.) (quoting Quick v. Donaldson, Co., 90 F.3d 1372, 1378 (8th Cir. 1996)).

Defendants note that Wilson slapped both male and female employees on the backside, but this does not defeat Mehl's claim.  She need not show that only women were subjected to harassment, "so long as she shows that women were the primary target of such harassment."  Beard, 266 F.3d at 798.  In any event, Wilson did far more than slap Mehl's backside three or four times:  over a three-month period, he (1) repeatedly touched her backside despite constant requests to stop; (2) slid his hand between her legs; (3) circled her breast with welding chalk; (4) told her that she "better be mindful of her actions" when she refused his request to reach inside his front pocket; and (5) rubbed her back and tapped on her bra strap in front of other employees at a training seminar.  None

of PortaCo's male employees endured similar treatment, and hence, a reasonable jury could conclude that Mehl was treated differently because of her sex.

## ii.  Objectively Severe and Pervasive

Defendants also argue that, even if Mehl shows that she was treated differently, a reasonable person would not have found Wilson's conduct sufficiently severe or pervasive to alter her employment conditions.  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); Quick, 90 F.3d at 1378.  When analyzing whether conduct crosses this threshold, the Court must evaluate "the frequency of the . . . conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance."  Arraleh v. Cnty. of Ramsey, 461 F.3d 967, 979 (8th Cir. 2006).  This is an objective, totality-of-the-circumstances standard.  Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998); Goins, 635 N.W.2d at 725.

Defendants rely on Anda v. Wickes Furniture Co., 517 F.3d 526 (8th Cir. 2008), and Duncan v. General Motors Corp., 300 F.3d 928 (8th Cir. 2002), to argue that the facts here cannot constitute a hostile work environment as a matter of law.  In those cases, however, the plaintiffs' superiors had no notice of sexually discriminatory conduct that "[rose] to the level of severe or pervasive."  Anda, 517 F.3d at 535 (plaintiff had reported several incidents, only two of which had any sexual overtones); see also Duncan, 300 F.3d at 935 ("A single request for a relationship, . . . four or five isolated incidents of [plaintiff's supervisor] briefly touching her hand, a request to draw a planter, and teasing

in the form of a poster . . . . do not meet the standard necessary for actionable sexual

harassment.")

Unlike <u>Anda</u>, Mehl's superiors knew about every instance of sexual misconduct

because either she reported it or her superior was the offender.  And she endured many

more instances of much more inappropriate contact than occurred in <u>Duncan</u>.  Wilson's

conduct was nearly constant over the three months Mehl worked for PortaCo.  He circled

her breast with welding chalk and rubbed her back in front of her coworkers, things that a

reasonable person would find humiliating and degrading.  He continued to slap her

backside despite knowing that she found it offensive.   His conduct caused her work to

suffer, and even sent her running through the workshop crying.  Based on the foregoing,

the Court concludes that sufficient evidence exists to present a question for the jury.

### B.  Constructive Discharge

Defendants next argue that Mehl should not be allowed to pursue a constructive-

discharge claim because her EEOC complaint asserted only a hostile work environment

claim.  They further argue that even if her constructive-discharge claim is allowed, it fails

for two reasons:  (1) the alleged misconduct was not so intolerable as to force her to quit;

(2) and she did not give PortaCo an opportunity to address her complaints before she

voluntarily quit.  None of these arguments is persuasive.

### i.  EEOC Charge

The general rule that a district court only has jurisdiction to hear Title VII claims

that are included in an EEOC charge is well-recognized.  <u>E.g.</u>, <u>EEOC v. Delight</u>

<u>Wholesale Co.</u>, 973 F.2d 664, 668 (8th Cir. 1992).  But courts must liberally construe an

administrative complaint, and "the scope of a subsequent action is not necessarily limited to the specific allegations in [an EEOC] charge."  Nichols v. Am. Nat'l Ins. Co., 154 F.3d 875, 886 (8th Cir. 1998).  Rather, "the sweep of any subsequent judicial complaint may be as broad as the scope of the EEOC investigation which could reasonably be expected to grow out of the charge of discrimination."  Cobb v. Stringer, 850 F.2d 356, 359 (8th Cir. 1988) (internal quotation omitted); accord Philipp v. ANR Freight Sys., Inc., 61 F.3d 669, 676 (8th Cir. 1995) ("[T]he plaintiff may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge.").

Mehl complained to the EEOC that Wilson's physical and verbal sexual harassment forced her to leave PortaCo.  (See Doc. No. 67, Attach. No. 5 ("I believe Mr. Wilson's sexual harassment created a hostile work environment that ultimately resulted in the termination of my employment with PortaCo, Inc.").)  The scope of an investigation arising from this charge could, therefore, reasonably be expected to include the circumstances surrounding Mehl's departure from PortaCo.  Accordingly, the Court concludes that her constructive-discharge claim is reasonably related to the substance of the allegations in her EEOC complaint and will address the claim's merits.

### ii.  Objectively Intolerable

"Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable with the intent to force her to quit."  Baker v. John Morrell & Co., 382 F.3d 816, 829 (8th Cir. 2004).  Whether working conditions are intolerable is judged by an objective standard.  Id.  Courts analyze constructive discharge

claims with a totality of the circumstances standard, looking to the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating or just offensive utterances, and whether it unreasonably interfered with the employee's work performance.  See Duncan, 300 F.3d at 935-36.

Mehl immediately reported Wilson's behavior to Julsrud, her direct supervisor. Nonetheless, Wilson later asked her to "give [him] nine inches" and chided her for being unwilling to reach into his pants pocket.  He circled her breast with welding chalk and rubbed her back in front of her coworkers, things that a reasonable person would find humiliating and degrading.  He continued to slap her backside despite knowing that she found it offensive.   His conduct caused her work to suffer, and even sent her running through the workshop crying.  Mehl's coworkers told her that they would not keep working there if they were forced to endure Wilson's behavior.  Indeed, because the fourth element of a hostile-work-environment claim and the first of a constructive-discharge claim are almost identical, it would be the rare case where a plaintiff could produce enough facts to establish a hostile work environment claim and unable to establish that the work environment was objectively intolerable.  Accordingly, the Court concludes that a reasonable juror could find the working conditions at PortaCo intolerable.

### iii.  Voluntarily Quit

Defendants also argue that Mehl's constructive discharge claim should fail because she did not give PortaCo a reasonable opportunity to correct the allegedly intolerable work environment before she voluntarily quit.  See Anda, 517 F.3d 534.  For

factual support, they point out (1) she was offered a raise and a permanent position with PortaCo the day before she left, and (2) Wilson pleaded with her to stay.  These arguments, however, fail to consider the reasonably foreseeable consequences of Wilson's actions.  A plaintiff "can satisfy the intent requirement with proof that her resignation was a reasonably foreseeable consequence of her employer's discriminatory actions."  Hanenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 575 (8th Cir. 1997); see also Hukkanen v. Int'l Union of Operating Eng'rs Hoisting & Portable Local No. 101, 3. F.3d 281, 285 (8th Cir. 1993) ("When an employer denies a conscious effort to force an employee to resign . . . the employer must necessarily be held to intend the reasonably foreseeable consequences of its actions.").  In the instant case, Mehl endured months of misconduct and repeatedly complained to her supervisor.  Her first of many complaints was in July, and she stayed with the company until October.  Quite simply, it was reasonably foreseeable that if Wilson's behavior did not change, Mehl would reach the breaking point and quit.  Her reactions to Wilson became more and more emotional, and at one point, she ran through the shop crying.  A reasonable jury could conclude that she was constructively discharged from PortaCo; accordingly, Defendants' Motion with respect to Mehl's constructive discharge claim will be denied.

### C.  Individual Liability for Wilson

Defendants assert that Wilson cannot be held individually liable for discriminatory acts under Title VII or the MHRA.  (Def.'s Mem. in Supp. at 13.)  Simply put, Title VII and the MHRA do not impose individual liability on supervisors or managers for sexual-harassment claims.  Lenhardt v. Basic Institute, 55 F.3d 377, 381 (8th Cir. 1995); Waag

v. Thomas Pontiac, Buick, GMC, Inc., 930 F. Supp. 393, 406-08 (D. Minn. 1996)

(Lebedoff, J.).  Mehl responds by urging the Court to pierce the corporate veil, arguing

that the corporation is Wilson's "alter ego," and piercing the veil is necessary to prevent

injustice and fundamental unfairness.  (Pl.'s Mem. in Opp'n at 27.)

In Minnesota, courts will pierce the corporate veil to enforce equity against

defendants who abuse the corporate form to further their own interests and protect

themselves from individual liability in the process.  See, e.g., Victoria Elevator Co. v.

Meridian Grain Co., 283 N.W.2d 509, 512 (Minn. 1979) (piercing the corporate veil to

hold a defendant individually liable for damages flowing from breaches of contract where

the defendant did not treat the corporation as a separate legal entity); Equity Trust Co.

Custodian ex rel. Eisenmenger IRA v. Cole, 766 N.W.2d 334, 339 (Minn. Ct. App. 2009)

(piercing the corporate veil to hold liable individual parties who used the corporate entity

for fraudulent purposes); Bank of Montreal v. Avalon Capital Grp., Inc., 743 F. Supp. 2d

1021, 1031 (D. Minn. 2010) (Davis, C.J.) (denying dismissal of complaint against

individual defendant when plaintiff alleged that he used the corporate form to commit

fraud).  Here, however, Mehl has produced no proof of undercapitalization, commingling

of funds, or any other hallmarks of fraudulent activity.  Accordingly, the Court will

dismiss the Title VII and MHRA claims against Wilson individually.

## II.    Battery

Mehl next asserts that Wilson's constant slapping of her backside and

inappropriate contact with her throughout her employment amounted to a common law

battery.  Defendants assert that this claim is preempted by the MHRA and subject to the

exclusivity of Minnesota's Workers Compensation Act (WCA).  The Court, however, disagrees.

### A.  MHRA Preemption

Defendants first argue that the MHRA preempts this claim, relying on Springer v. McLane Co., 692 F. Supp. 2d 1050 (D. Minn. 2010) (Kyle, J.).  In Springer, this Court examined MHRA preemption as it related to the plaintiff's claims of pregnancy discrimination, disability discrimination, and reprisal—all in violation of the MHRA— and negligent supervision.  In the present case, however, Mehl brings MHRA and battery claims.  A more analogous case is Wirig v. Kinney Shoe Corp.—a case on which this Court relied in Springer—where the plaintiff asserted claims of sexual harassment under the MHRA and common law battery.  461 N.W.2d 374 (Minn. 1990).  There, the Minnesota Supreme Court held "that a sexual harassment action brought pursuant to the MHRA does not bar a parallel action for common law battery," id. at 379, and this Court sees no principled reason to hold otherwise.

### B.  WCA Exclusion

Defendants also argue that Mehl's battery claim is subject to the exclusivity of the WCA.  The WCA provides the exclusive remedy to employees for personal injuries arising out of and in the course of employment.  McGowan v. Our Savior's Lutheran Church, 527 N.W.2d 830, 833 (Minn. 1995).  One exception to the WCA's exclusivity is the "assault exception," which excludes WCA application to "an injury caused by the act of a third person or fellow employee intended to injure the employee because of personal

reasons, and not directed against the employee as an employee, or because of the employment." Minn. Stat. § 176.011, subd. 16.

The question, then, is whether the assaults at issue were motivated by the assailant's personal animosity toward the victim. McGowan, 527 N.W.2d at 834. If the employee's job function was not related to the asserted injury, then the assault exception applies and the WCA does not bar the employee's common law claim. Stengel v. E. Side Beverage, 690 N.W.2d 380, 386 (Minn. Ct. App. 2005) (relying on Meintsma v. Loram Maint. of Way, Inc., 684 N.W.2d 434 (Minn. 2004) (finding that the assault exception did not apply to an employee ritual of birthday spankings because the motivation arose out of the employee's status as an employee rather than personal animosity) and McGowan, 527 N.W.2d 830 (holding that the assault exception did not apply to plaintiff's tort action because her employment required her to be in isolated places with individuals, which was a causal factor that contributed to her rape)). Thus, if the injury occurred because of the Mehl's status as an employee or as a result of performing the functions of her job, then the assault exception does not apply.

Defendants assert that the assault exception does not apply to Mehl's claim because Wilson was not motivated by personal animosity or sexual desire when he repeatedly touched her backside. The Court disagrees. The record supports the assertion that Wilson's management style included walking behind his employees and smacking or grabbing their backsides. Numerous employees endured this behavior. If Mehl's complaint alleged only slaps on the backside, the WCA would preempt her battery claim

because this kind of contact would be one of the "associations and conditions inseparable from" employment at PortaCo.  Indeed, this result would be dictated by <u>Meintsma</u>.

Nothing in the record, though, shows that Wilson regularly reached into his other employees' pockets, drew circles around their breasts with welding chalk, grabbed between their legs, rubbed other employees' backs, or outlined their bra straps in front of coworkers during training seminars.  It would be an unreasonable stretch to conclude that Mehl's duties as a PortaCo welder put her at risk for groping.  And unlike <u>Meintsma</u>, PortaCo has no policy—official or otherwise— condoning Wilson's conduct.  His motivations were personal, and the contact had no association with Mehl's duties as a welder.  Therefore, the assault exception to the WCA applies to her assault claim, and Defendants' Motion will be denied.

### III.  Punitive Damages

Defendants also move to dismiss Mehl's claim for punitive damages, and argue that she failed to mitigate her damages as a matter of law.  In the Court's view, these issues should be held in abeyance pending trial, at which time a full evidentiary record will be available for the Court's review.  Accordingly, Defendants' Motion will be denied with respect to punitive damages and mitigation of damages.

### CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 65) is **GRANTED IN PART** and **DENIED IN PART**.  With respect to Mehl's Title VII and MHRA claims against Wilson in his individual capacity, the Motion is **GRANTED** and

the claims against him are **DISMISSED WITH PREJUDICE.**  In all other respects, the

Motion is **DENIED**.[2]


Date:  May 7, 2012                          s/Richard H. Kyle                   
                                            RICHARD H. KYLE
                                            United States District Judge

---

[2] In denying the Motion, the Court in no way expresses an opinion on Mehl's likelihood of success at trial, or her ability to survive a motion for judgment as a matter of law after the presentation of her case.